## United States Bankruptcy Court

### Eastern District Of Washington

| | |
|---|---|
| In Re: | ) |
| | ) |
| HW PARTNERS, LLC | ) Main Case Number: 11-03366-JAR11 |
| | ) |
| | ) |
| Debtor | ) |
| LESTER AND BESTYDIANNE | ) **Adversary Number: 11-80317-JAR** |
| HENDRICKSON | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| HW PARTNERS, LLC, MKA REAL | ) |
| ESTATE QUALIFIED FUND LLC., | ) |
| et al | ) |
| | ) **MEMORANDUM** |
| Defendant | ) |
| | ) |
| | ) |
| | ) |

This matter comes before the Court upon summary judgment motions filed by the plaintiffs, Lester L. and Betsydianne Hendrickson ("Hendricksons") and the defendant MKA Real Estate Qualified Fund I, LLC, ("MKA"). The Hendricksons and MKA are both creditors of the chapter 11 debtor HW Partners LLC, ("HWP"). There has been extensive litigation in both the chapter 11 case and in this adversary proceeding (a case removed from a Walla Walla County Superior Court). This Court has entered "Findings of Uncontested Facts Supporting Summary Judgment Decision" detailing the factual contentions and procedural history to this point, and constitutes the basis upon which this memorandum is rendered. The dispute between Hendricksons and MKA, two creditors of HWP, is over entitlement to the proceeds of the bankruptcy sale of the debtor HWP's property.

1

## JURISDICTION

This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 157(a) and (b). The United States District Court for the Eastern District of Washington has referred these matters to the Bankruptcy Court. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (K), (N), and (O). In the event that it is determined that this matter is in fact "related to" a case under Title 11, all parties to the proceeding have consented to this Court entering appropriate final orders and judgments. 11 U.S.C. § 157(c)(2).

## SUMMARY OF THE DISPUTES

HWP and HFI were developers of the Eritage Project. The Project was to acquire farmland, develop the land, sub divide it into parcels which could be used as residences with vineyards, and sell them. HWP and HFI respectively were to acquire 240 acres and 80 acres. They needed money to fund this enterprise. Westmoore was to be the source of those funds.

MKA loaned money to Westmoore secured by notes given to Westmoore by HWP and HFI. HWP and HFI ultimately collateralized these notes with real estate mortgages. These mortgages were then assigned to MKA. Although MKA never took possession of the HWP and HFI notes, it did record the assignments of mortgages in Walla Walla County.

HWP, HFI and Westmoore decided to rewrite their transactions. HFI quit claimed its interest in its mortgaged property to HWP. HWP and Westmoore consolidated the outstanding notes into one large note for $3,226,249.40. In this process they satisfied the older notes, released the older mortgages and issued new mortgages securing the new consolidated note. At the time of this rewrite, either Westmoore or HWP had possession of the original HWP & HFI notes. The satisfaction of the HWP and HFI notes and release of mortgages was done without

2

the knowledge or express consent of MKA. Westmoore knew that MKA had an interest in the satisfied notes and mortgages. Whether HWP and HFI had knowledge of MKA's interest at the time of the rewrite is disputed.

Westmoore, then with the help of Jason Huntley, borrowed $1,000,000.00 from the Hendricksons. Westmoore's note to Hendricksons was secured by the new HWP note, which was placed in escrow, and by assignment of the new HWP mortgages on the Eritage project to Hendricksons. Hendricksons filed a UCC financing statement with the State of Washington on October 23, 2008, and recorded their assignments of mortgage on the same day.

Westmoore defaulted on the $1,000,000.00 note. On default the note was delivered out of escrow to the Hendricksons. Hendricksons proceeded to enforce the HWP consolidated note for $3,226,249.40. During that process, Hendricksons discovered the existence of MKA's claim to the original notes and mortgages of HWP and HFI. MKA on discovering the competing claim by Hendricksons to its collateral filed a UCC financing statement in California on June 2, 2009.

Hendricksons brought this suit in Walla Walla County Superior Court to establish their priority and foreclose on their collateral. MKA in their answer sought first a judgment against Westmoore on its notes to MKA, and then foreclosure against the HFI and HWP mortgages to the extent of MKA's interest therein. The suit was removed to this Court after HWP filed this Chapter 11. In the course of the bankruptcy case, the property was sold, with Hendricksons' and MKA's respective claims attaching to the sale proceeds.

This Court authorized sale free and clear of liens of the Debtor's real property and water rights for $2,300,000.00. (Main case Doc. #131 pp. 1-11). The real estate parcels sold were Estate Nos. 1, 2, 3, 4, 5, 6, 7, 10, and the "Access Estate." (Main case Doc. # 120). The sale

3

order made no allocations of value to either the real estate parcels or the water rights. These issues were reserved for future determination in this adversary proceeding. (Main case Doc. 131 ¶ g pp. 10-11). The sale having been completed, the parties entered into mediation. It was agreed that the sum of $1,950,000.00 of the sale proceeds would be held subject to court order pending resolution of the competing secured claims of Hendricksons and MKA to those sale proceeds.

The secured claims of these parties, in the collateral, do not perfectly mirror each other.

The following chart reflects the difference between the parties' claims to the individual parcels.

| Estate | Sole Claimant | Competing Claims |
|---|---|---|
| #1 | MKA | |
| #2 | | Hendricksons/MKA |
| #3 | | Hendricksons/MKA |
| #4 | | Hendricksons/MKA |
| #5 | Hendricksons | |
| #6 | | Hendricksons/MKA |
| #7[1] | | Hendricksons/MKA |
| #10 | | Hendricksons/MKA |
| Access Estate | | neither claimant has mortgages |

Based on this analysis MKA would be entitled to the proceeds from Estate #1 and Hendricksons would be entitled to the proceeds of Estate No. 5. Hendricksons however dispute MKA's claim to the proceeds of Estate No. 1, arguing that the note secured by MKA's assigned

---

[1] The mortgage that was assigned to MKA on Estate No. 7 contains an incorrect legal description. The mortgage that was assigned to Hendricksons has the correct legal description.

4

mortgage has been satisfied. MKA answers that it never consented to that satisfaction, it was done without authority, and it is void.

The remaining dispute relates to Estates Nos. 2, 3, 4, 6, 7 and 10. MKA claims primacy on these parcels based on the prior recording of its assignments of mortgages in the real estate records of Walla Walla County. Hendricksons bases its claims of priority on the perfection of their security interests under Washington State's Uniform Commercial Code. If the Hendricksons prevail on their argument, they would be entitled to priority in six Estates including Estate No. 7. If MKA's arguments prevail it would be entitled to the proceeds of Estate Nos. 2, 3, 4, 6 and 10. However MKA will have to deal with the consequences, if any, of the incorrect legal description contained in the mortgage on Estate 7 and the assignment of that faulty mortgage to MKA.

For a period during this litigation, Hendricksons and MKA were enjoined from enforcing their claims against Westmoore, which was in receivership. The Receivership Court has recently lifted its injunction to enable this Court to decide the dispute between Hendricksons and MKA over the sale proceeds.

The matter is now ripe for determination of the validity and priority of Hendricksons and MKA's competing secured claims.

## FACTS

The facts surrounding these claims are complicated and require a detailed discussion.

MKA claims it is secured in the proceeds of the sale of HWP's property. This claim is based on Westmoore's "Secured Promissory Note" to MKA dated September 4, 2007, in the sum

5

of $859,000.00. Paragraph 4 of this note provides that MKA is secured by the HFI note to Westmoore dated July 20, 2007, in the amount of $850,000.00 and possibly other collateral.

MKA's claim is also based on Westmoore's "Secured Promissory Note" dated September 21, 2007 in the sum of $ 3,100,000.00. Paragraph 7 of this note provides that the note is secured by the HWP note to Westmoore dated July 31, 2007, in the sum of $1,600,000.00, and multiple other notes and deeds of trust securing obligations to Westmoore.

These terms create security interests in the HFI and HWP notes. MKA did not take possession of these notes nor did it attempt at that time to perfect its security interest in the notes by filing a UCC financing statement. MKA's security interests in these two items of personal property, the notes payable to Westmoore by HFI and HWP, were unperfected.

Both HFI and HWP were to use the money loaned from Westmoore, represented by the July 20, 2007 and July 31, 2007 notes to acquire real estate. When the real property was acquired, both HFI and HWP were obligated to collateralize their respective notes with mortgages on the property acquired.

HWP was the first to purchase real estate. Upon acquisition, it granted Westmoore mortgages on the property it acquired, Eritage Estate Nos. 1, 2, 3, 4 and 6. These five mortgages to Westmoore secure HWP's note to Westmoore of July 31, 2007. That note was in the sum of $1,600,000.00. Each of the five mortgages is in the sum of $320,000.00.

Likewise, when HFI purchased its real estate, it granted mortgages to Westmoore on the property acquired, Eritage Estate Nos. 7 and 10. These two mortgages to Westmoore secure HFI's note to Westmoore of July 20, 2007. That note was in the sum of $850,000.00, and these mortgages were in the sum of $425,000.00 each.

6

After HWP and HFI had closed their respective real estate acquisitions, and issued their mortgages to Westmoore, Westmoore assigned the mortgages to MKA. The mortgage assignments, by their terms, also assigned the notes secured by the mortgages to MKA. MKA's mortgage assignments were recorded in the records of Walla Walla County, as to HFI on April 2, 2008 and as to HWP on June 5, 2008.

The mortgage and note assignments were not a transfer of ownership from Westmoore to MKA. MKA's notes and related mortgages were security for a debt owed MKA by Westmoore. MKA did not take possession of either of the HFI and HWP notes. Nor did it notify HFI or HWP that they were now liable on these notes to MKA. MKA and the other parties, treated Westmoore as the owner of the notes, and HFI and HWP as liable on these notes to Westmoore.

HFI and Westmoore during the spring of 2008 engaged in a number of transactions involving the HFI/Westmoore mortgages. The original two mortgages dated March 31, 2008, were each in the amount of $450,000.00. The original mortgage on Tract 2 (Est. 7) contained an incorrect legal description. These two original HFI mortgages were satisfied, and HFI executed two new mortgages to Westmoore dated May 22, 2008 and recorded May 28, 2008. The new mortgage on Tract 2 (Est. 7) contained the correct legal description and was in the amount of $ 550,000.00. The new mortgage on Tract 5 (Est. 10) was in the amount of $300,000.00. Both replacement HFI mortgages secured the July 20, 2007 HFI/Westmoore note. MKA asserts that it had no knowledge of these transactions and that they were done without its consent.

At this same time, HFI and Westmoore were in the process of adjusting their accounts with each other. In this process the July 20, 2007 note balance was to be reduced to $525,000.00. A new note was to be issued by HFI to Westmoore in the sum of $870,000.00 secured by a deed of trust on Tract 5 (Est. 10). An unsigned copy of that note dated June 20,

7

2008 was supplied to the Court. It does not appear that this note was ever signed or that the referenced mortgages were ever executed. Nevertheless, the accounting between HFI and Westmoore was apparently adjusted on Westmoore's books.

In the fall of 2008, HWP, HFI and Westmoore decided to rewrite their transactions. HFI quit claimed its interest in its mortgaged property to HWP. HWP and Westmoore consolidated the outstanding notes into one large note for $3,226,249.40. ("the Consolidation Note"). In this process they satisfied the older notes, released the older mortgages and issued new mortgages securing the Consolidation Note.

This note dated September 30, 2008, between HWP and Westmoore "consolidates and pays off all current between HWP, HFI and Westmoore." It identifies the instruments replaced as follows:

1) HFI note of June 20, 2008
$904,024.66, including capitalized interest

2) HWP note of July 31, 2007
$1,740,513.98 plus interest of $43,512.84

3) HFI note of July 2, 2007
$525,000.00 plus interest of $13,197.94

for a total of $3,226,249.40 due on this new note.

The July 31, 2007 HWP/Westmoore note is the same note in which MKA holds a

security interest and which was identified in Westmoore's assignments of note and mortgages to

MKA.

Some confusion surrounds the two HFI notes referenced.

8

The reference to the July 2, 2007 HFI note is evidentially a scrivener's error. The reference should actually be to the July 20, 2007 note. The reference to the HFI June 20, 2008 note, is to the unsigned note which was to represent the adjustment of the HFI debt on Tract 5 (Est. 10). The total of these two notes arguably reflect HFI's adjusted debt owed to Westmoore and secured by Estate Nos. 7 and 10.

Shortly after executing the Consolidation Note, and the new mortgages collateralizing it, Westmoore sought to borrow additional money. Westmoore borrowed $1,000,000.00 from Hendricksons, evidenced by a note, and granted Hendricksons a security interest in the Consolidation Note and its collateralizing mortgages.

Hendricksons perfected its security interest in the Consolidation Note by filing on October 23, 2008, a UCC-1 financing statement with the Washington Secretary of State, and by recording on October 23, 2008, an assignment of mortgages in Walla Walla County, and by taking possession of the note through an escrow agent. Hendricksons had no actual knowledge of MKA's claims at the time they loaned the money and perfected their security interests.

When Westmoore failed to repay the $1,000,000.00 when it became due on December 31, 2008, the escrow agent delivered the Consolidation Note to Hendricksons; Hendricksons commenced their attempts to realize on their collateral shortly after December 31, 2008.

In the late spring of 2009, MKA became aware that the Hendricksons were asserting competing claims to MKA's collateral. Upon learning of this dispute, MKA filed a UCC

9

financing statement with the California Secretary of State. This UCC-1 was filed on June 2,

2009. It names Westmoore as the debtor and MKA as the secured party. The miscellaneous box

10 of the UCC-1 the form provides:

"Loan- Westmoore Huntley #21- $3,100,000.00"

The UCC-1 also has attached to it an Exhibit A which provides:

### Description of Collateral

All of the following described property (collectively, the "Collateral"), whether
now or herein after acquired, and in which the Debtor now has or hereafter
obtains any right, title, Estate or Interest, together with all additions and
accessions thereto and replacements therefore, and all proceeds of such property,
subject and subordinate in lien and in payment to the lien and payment of any
deed of trust recorded against the property prior to the recording of this fixture
filing (for purposes of this Exhibit "A", the term "proceeds" includes whatever is
receivable or received when the following described property or proceeds is sold,
collected, exchanged, or otherwise disposed of, whether such dispositions is
voluntary or involuntary, and includes, without limitation, all rights to payment,
including return premiums, with respect to any instance relating thereto):

1. All shares of stock or other evidence of ownership of any part of the
   Collateral that is owned by Debtor in common with others, including
   all documents and rights of membership in any owners' or members'
   association or similar group having responsibility for managing or
   operating any party of the Collateral;

2. Without limiting the above, all goods, accounts, documents,
   instruments, money, deposit accounts, chattel paper and general
   intangibles, as those terms are defined in the Commercial Code from
   time to time in effect in the State of California; and

3. All proceeds, replacements, substitutions, products, accessions and
   increases within any one or more of the following types of collateral;
   goods, equipment, inventory, instruments, chattel papers, documents,
   accounts or general tangibles.

Although this filing is ambiguous, it does provide a clear representation that at the time of

the filing, June 2, 2009, Westmoore was still indebted to MKA. What is unclear is the extent of

the MKA collateral which it claims by this filing.

The Court in deciding the issue before it will give MKA the benefit of the most expansive interpretation of the security interest asserted by this filing. This presumes that the "Loan-Westmoore Huntley #21- $3,100,000.00" is in fact the Eritage Project, as opposed to other dealings between Westmoore and MKA. This would include a security interest in the July 31, 2007, HWP/Westmoore $1,600,000.00 note, specifically declared as collateral in the September 21, 2007, Westmoore/MKA $3,100,000.00 note. It arguably could also include the July 20, 2007, HFI/Westmoore $850,000.00 note which related to the Eritage project. After HFI acquired real estate, it mortgaged the same to Westmoore, which in turned assigned the note and the mortgages securing it to MKA. It also could extend to any other notes and mortgages received by Westmoore from either HWP or HFI as a result of the Eritage Project. The exhibit attached to the MKA financing statement, explicitly asserts a claim to the proceeds of the collateral, presumably the Eritage Project. This claim to the proceeds of the collateral includes: "whatever is receivable or received..." These proceeds specifically include..." instruments"..."replacements, substitutions" of instruments. MKA, under the terms of its financing statement, extends its claim to the July 20, 2007 HFI/Westmoore note, the July 31, 2007 HWP/Westmoore note and the Consolidation Note.

Hendricksons commenced this law suit to establish the priority of their interest and foreclosure against MKA. MKA cross claimed against Hendrickson to establish its priority and foreclosure on its claim. These issues are now before the Court on summary judgment.

## DISCUSSION

The issues before the Court present the problem of conflicting means of perfecting one's interest in collateral which has both a personal property and real property character. Depending

11

on which discipline controls produces different results. The Court will examine the outcome of the dispute under the real estate rules.

I.     Real Estate Law

MKA's primary argument for priority in the sales proceeds is based on its assertion that it was the first party to record its interest on the real estate records of Walla Walla County, thus giving constructive notice to the world of its interest in the real estate.

MKA acquired a security interest in HFI's July 20, 2007 note under the terms of Westmoore's note to MKA of September 4, 2007. Likewise, MKA acquired a security interest in HWP's July 31, 2007 note under the terms of Westmoore's note to MKA on September 21, 2007. Both HFI's and HWP's notes were to be collateralized by mortgages on the real property acquired by HFI and HWP respectively. HFI and HWP did acquire the Eritage real property and after acquiring it gave Westmoore mortgages on the property acquired. These mortgages were then assigned to MKA by Westmoore. These assignments were recorded in Walla Walla County on April 18, 2008 as to the HFI mortgages and June 5, 2008 as to the HWP mortgages.

The mortgage and note assignments were not a transfer of ownership of the notes and mortgages from Westmoore to MKA. MKA did not take possession of the HFI or the HWP notes. Nor did it notify HFI or HWP that they were now liable on these notes to MKA. MKA and the other parties treated Westmoore as the owner of the notes and HFI and HWP as liable on these notes to Westmoore. These notes and related mortgages were security for debts owed to MKA by Westmoore as evidenced by MKA's filing of its UCC-1 showing Westmoore as the debtor, and by its actions in this lawsuit/adversary proceeding by seeking judgment against Westmoore, foreclosure and sale of its interest against the property, and a deficiency judgment against Westmoore for any shortfall.

12

The mortgage assignments were transfers of lien interests to MKA as opposed to outright ownership of the mortgages. Recording of the assignments provided constructive notice pursuant to the recording statute of MKA's acquisition of an interest in the real estate, as of April 18, 2008 of the HFI interests and June 5, 2008 as to the HWP interests.

By contrast Hendricksons perfected their interest in the HWP/Westmoore mortgages securing the Consolidation Note by recording their assignments of mortgages in the real estate records of Walla Walla County on October 23, 2008.

Thus if the controlling method of perfection of interest is based on the real estate rules established by the recording statute, MKA would prevail on the basis of the constructive notice provided by its prior recordings.

II.   UCC

Under the personal property rules, MKA acquired a security interest in the July 20, 2007 HFI note to Westmoore, by the terms of Westmoore's September 4, 2007 note to MKA. Likewise, it acquired a security interest in the July 30, 2007 HWP note to Westmoore by terms of Westmoore's September 21, 2007 note to MKA. RCW 62A. 9A-109(a)(1); RCW 62A. 9A-102(72). As a result MKA is a "secured party" claiming "security interest" in the July 20, 2007 note from HFI to Westmoore and the July 30, 2007 note from HWP to Westmoore. These notes which "evidence a right to payment of a monetary obligation" are "instruments" under the definitions of Article 9. RCW 62A.9A-102 (47). MKA is a "secured party" claiming a "security interest" in the July 31, 2007 note from HWP to Westmoore and the July 20, 2007 note from HFI to Westmoore.

The law provides two ways a secured party can perfect its security interest in instruments, either by filing or taking possession. RCW 62A.9A-312(a); RCW 62A.9A-313(a). MKA never

13

took possession of either the July 20, 2007 HFI note to Westmoore nor the July 31, 2007 HWP note to Westmoore. It did attempt to perfect its security interest in those instruments by its June 2, 2009, filing of a UCC-1 with the California Secretary of State. Allowing MKA the benefit of the broad inference that the language "Loan-Westmoore Huntley #21- $3,100,000.00" identifies the Eritage Project, this filing arguably applies not only to the original HFI July 20, 2007 note and the HWP July 31, 2007 note but also the $3,226,249.40 HWP/Westmoore Consolidation Note as proceeds, renewal or replacement of the original HFI and HWP notes. This inference is allowed for the limited purpose of enabling the Court to deal with the parties' motions for summary judgment without resolving this potentially disputed question of fact. With this understanding, the Court gives MKA's UCC-1 filing its broadest scope and interpretation.

Applying the applicable personal property rules articulated by the Uniform Commercial Code, MKA perfected its security interest in the right to payment under the HFI note, HWP note and the HWP/Westmoore Consolidation Note by filing on June 2, 2009.

In contrast Hendricksons perfected their security interest in the Consolidation Note and its collateralizing mortgages on October 23, 2008 by filing its UCC-1 financing statement with the Washington Secretary of State Office, RCW 62A.9A-312(a); by taking possession of the Consolidation Note by their escrow agent on or about November 6, 2008, RCW 62A.9A-313; and by taking possession of the note post default on or about January 5, 2009. RCW 62A.9A-313. Any and all of these dates constitute perfection of Hendricksons security interest prior to MKA's perfection on June 2, 2009, RCW 62A.9A-322. Applying the UCC rules, Hendricksons prevail over MKA.

14

III. Choice of Law

The dispute comes down to whether the priority of the competing secured claims is determined by application of the rule of first to filed in the real estate records as to the mortgaged property or the personal property rules applicable under the Uniform Commercial Code. If the real estate rules apply MKA wins because it was first to file on the real estate. If the personal property rules of the Uniform Commercial Code apply, Hendricksons win as the first to perfect their personal property security interests.

The Court starts its analysis by examining the statutory scheme for perfecting a security interest in personal property under the terms of Washington's version of the Uniform Commercial Code.

Creation of a security interest requires a "security agreement" which means "an agreement that creates or provides for a security interest." RCW 62A.9A-102(73). Both MKA and Hendricksons are granted security interests by language contained in their respective notes.

Westmoore's note to MKA dated September 4, 2007 in the amount of $859,000.00 provides in its terms that it is secured by HFI's note to Westmoore dated July 20, 2007 in the sum of $850,000.00. Westmoore's note to MKA dated September 21, 2007 in the amount of $3,100,000.00 provides in its terms that it is secured by HWP's note to Westmoore dated July 31, 2007 in the sum of $1,600,000.00. Thus MKA acquired its security interest in the HFI and HWP notes.

15

Westmoore's note to Hendricksons dated October 23, 2008 provides in its terms that it is secured by HWP's note to Westmoore dated September 30, 2008 in the sum of \$3,200,000.00.[2] Thus Hendricksons obtained its security interest in the HWP/Westmoore note.

The UCC applies to transactions that create security interests in personal property. RCW 62A.9A-109(1). These notes all represent promises to pay monetary obligations arising out of the Eritage Project and secured by essentially the same real estate collateral. MKA argues that because the notes are secured by real estate the personal property rules (UCC) do not apply. MKA argues that Article 9 does not apply to "the creation or transfer of an interest or lien on real property..." RCW 62A.9A 109(d)(11). Therefore MKA was able to perfect its interest in the real estate mortgages pursuant to Washington's real estate recording statute RCW 65.08.070, separate and independent of the UCC rules.

This argument is not persuasive when one considers all the provisions of 62A.9A-109 which defines the scope of the UCC in Washington.

Notes are instruments and by themselves are personal property. RCW 62A.9A-102(47); In re Allen, 134 B.R. 373, 375 (9th Cir. BAP 1991). The fact that the notes are themselves secured by real estate mortgages is immaterial to their status as personal property. RCW 62A.9A-109(b) provides:

**Security interest in secured obligation.** The application of this Article to a security interest in a secured obligation is not affected by the fact that the obligation is itself secured by a transaction or interest to which this Article does not apply.

---

[2] The statement in the note is in error as to the amount of the September 30, 2008 note. The actual amount of the note is \$3,226,249.40. This error is immaterial. The parties are clearly referring to the actual HWP/Westmoore September 30, 2008 note.

16

Admittedly RCW 62A.9A-109(d)(11) takes creation or transfer of an interest or lien on real property outside the scope of Article 9. However it provides a specific exception for liens on real property. It provides in part as follows:

(d) **Inapplicability of Article.** This Article does not apply to:

•••

(11) The creation or transfer of an interest in our lien on real property, including a lease or rents thereunder, except to the extent that provision is made for:
(A) Liens on real property in RCW 62A.9A-203 and 62A.9A-308;

•••

Section RCW 62A.9A-203 provides when attachment of a security interest takes place.

Subsection (g) of that section provides:

**(g) Lien securing right to payment**. The attachment of security interest in a right to payment or performance secured by a security interest or other lien on personal or real property is also attachment of a security interest in the security interest, mortgage, or other lien.

Thus, Washington's enactment of Article 9 adopts the rule that attachment of the security interest in the right to payment, in this case the notes/instruments, also constitutes attachment to the collateral securing the right to payment, i.e. the real estate mortgages.

This idea that the mortgage follows the obligation is firmly established in Washington law.

In Washington, "[a] mortgage creates nothing more than a lien in support of the debt which it is given to secure." *Pratt v. Pratt,* 121 Wash. 298, 300, 209 P. 535 (1922) (citing *Gleason v. Hawkins,* 32 Wash. 464, 73 P. 533 (1903)); *see also* 18 STOEBUCK & WEAVER, *supra,* § 18.2, at 305.

Bain v. Metropolitan Mortgage Group, et al, 175 Wash 2d 83 at 92, 285 P.3d 34 at 38 (2012).

This principle is also recognized by leading commentators.

17

> The most fundamental statement we can make about obligation
> and mortgage is that the obligation is primary and the mortgage ancillary
> to it...Transfer of the obligation carries the mortgage with it, but an
> attempt to transfer the mortgage alone may not transfer either obligation or
> mortgage. Washington is a "lien-theory" state...

William B. Stoebuck and John W. Weaver, Washington Practice: Real Estate: Transactions §

18.2 (Thompson/West 2d.ed. 2004). The Washington Supreme Court has cited this premise with

acceptance

> "Stoebuck and Weaver note that transfer of mortgage backed obligations is
> governed by the UCC..." and that...
> Washington's deed of trust act contemplates that the security instrument will
> follow the note, not the other way around.

Bain, 175 Wash. 2d at 104, 285 P.3d at 44.

Rejecting the idea that only one statutory scheme, the UCC, governs transactions

regarding notes secured by mortgages, MKA argues that the real estate recording governs

perfection of collateral interests as well. This bifurcated approach, between perfection in the

note and perfections in the real estate, was adopted in the case of In re Maryville Savings & Loan

Corporation, 743 F. 2d 413 (6th Cir. 1984), clarified on reconsideration 760 F.2d 119 (1985).

This bifurcated approach to perfection has been sharply criticized. James J. White & Robert S.

Summers Uniform Commercial Code § 30-8 p. 54 (5th ed. 2002 Thompson/West), Grant S.

Nelson & Dale A. Whitman Real Estate Finance Law, § 528 p. 401 (5th ed. 2007

Thompson/West).

This discredited position has been effectively dealt with by the 2000 amendments to the

Washington's UCC, RCW 62A.9A-109(b), 62A.9A-109(d)(11)(A), 62A. 9A-203(g) and

62A.9A-308(e). The impact of these provisions of the UCC is reflected in the Official

Comments to 9A-109:

18

**7. Security Interest in Obligation Secured by Non-Article 9 Transaction.**
Subsection (b) is unchanged in substance from former Section 9-102(3). The
following example provides an illustration.

**Example 1:** O borrows $10,000 from M and secures its repayment obligation,
evidenced by a promissory note, by granting to M a mortgage on O's land. This
Article does not apply to the creation of the real-property mortgage. However, if
M sells the promissory note to X or give a security interest in the note to secure
M's own obligation to X, this Article applies to the security interest thereby
created in favor of X. The security interest in the promissory note is covered by
this Article even though the note is secured by a real-property mortgage. Also,
X's security interest in the note gives X an attached security interest in the
mortgage lien that secures the note and, if the security interest in the note is
perfected, the security interest in the mortgage lien likewise is perfected. See
Sections 9-203, 9-308.

It also follows from subsection (b) that an attempt to obtain or perfect a security
interest in a secured obligation by complying with non-Article 9 law, as by an
assignment of record of a real-property mortgage, would be ineffective. Finally,
it is implicit from subsection (b) that one cannot obtain a security interest in a
lien, such as a mortgage on real property that is not also coupled with an equally
effective security interest in the secured obligation. This Article rejects cases
such as in re *Maryville Savings & loan Corp.*, 743 F.2d 413 (6th Cir. 1984),
clarified on reconsideration, 760 F.2d 119 (1985).

The UCC provisions clearly reject the position advocated by MKA for a Maryville system of

bifurcation of perfection between personal property under the UCC and real estate under the

recording statute. The mortgage follows the note. Bain, 175 Wash.2d at 104, 285 P.3d at 44.

First to perfect in the right to payment evidenced by the note also perfects as to the mortgage.

Priority is determined at the time at which the creditor perfects its security interest. The means

of perfection varies with the type of collateral. In this instance, both MKA and Hendricksons

claim a security interest in rights to payment evidenced by notes collateralized by real estate

mortgages on essentially the same real property, the Eritage Project. Perfection of a security

interest in notes is either by taking possession of the note RCW 62A. 9A-313(a), or by filing

RCW 62A.9A-312(a).

19

Although MKA was the first to acquire a security interest in the notes, it never took possession of the notes. Its claim to perfection of its security interest rests on its June 2, 2009 filing with the California Secretary of State.[3]

Hendricksons have taken multiple actions to perfect their security interest in the September 30, 2008 HWP/Westmoore Consolidation Note. Hendricksons perfected their interest in the note by their UCC-1 filing with the Secretary of State in Washington on October 23, 2008. RCW 62A.9A-312(a). Although Westmoore was a California entity, the note was located in Washington. RCW 62A.9A-301(3). Hendricksons' perfection by filing was accomplished on October 23, 2008. The Consolidation Note was placed in escrow with Hendricksons' lawyer Paul Larson on or about November 6, 2008. This delivery of the note into escrow, also perfected Hendricksons' security interest. RCW 62A.9A-313(c). Finally upon default, pursuant to the escrow instructions, the Consolidation Note was delivered to the Hendricksons on or shortly after January 5, 2009. This delivery of the note to Hendricksons further perfected their security interest in the Note by possession. RCW 62A.-9A-313(a).

Whether perfection is measured from the date of their filing, October 23, 2008, or the date the note was deposited in escrow, November 6, 2008, or the date Hendricksons obtained actual possession of the note on January 5, 2009, their perfection in the note was prior in time to the perfection claimed by MKA on June 2, 2009. Being first to perfect their security interest in the collateral under the UCC they have priority over MKA's claim. RCW 62A.-A-322. This priority dispute is controlled by the personal property rules established by the UCC rather than the real estate rules established under the recording statute.

---

[3] This assumes that the notes in question were physically located in the State of California. The location of the HFI July 20, 2007 note and the July 30, 2007 HWP note is unknown and disputed. Therefore perfection by filing in California is in doubt. RCW 62A.9A-301(3)(c). For purposes of this decision only, the Court will consider the California filing effective as to the July 20, 2007 HFI note and the July 31, 2007 HWP note. It is undisputed that the September 30, 2008 note was located in Washington.

Based on this analysis, Hendricksons have priority over the secured claims of MKA as to the proceeds of Eritage Estate Nos. 2, 3, 4, 6, 7 and 10.

MKA does not have an assignment of mortgages as to Estate No. 5. Therefore it does contest Hendricksons' right to the proceeds from that parcel.

Hendricksons do not have an assignment of a mortgage on Estate No. 1 securing the Consolidation Note. MKA does have an assignment of mortgages on Estate No.1, securing the June 31, 2007 HWP/Westmoore note. Hendricksons take the position that HWP and Westmoore satisfied that note and released the mortgage in the course of the September 30, 2008 consolidation. Since that note was satisfied, there is no obligation and therefore there is no mortgage to secure it. MKA responds that Westmoore and HWP had no authority to rewrite and satisfy these notes and mortgages without MKA's knowledge and consent. Therefore the satisfactions and releases were void.

Hendricksons' position is premised on the argument that MKA had made Westmoore its collection agent as to the HFI and HWP notes, thus giving them the authority to collect, adjust, rewrite and satisfy these obligations in the ordinary course of business. Therefore MKA is bound by Westmoore's actions. Rogers v. Seattle-First National Bank, 40 Wash. App. 127, 697 P.2d 1009 (1985). The nature of the agreement between MKA and Westmoore, as to their various duties and responsibilities is disputed. The knowledge and motives of the participants MKA, Westmoore, HFI, HWP and Jason Huntley in these transactions is hotly contested. There are significant disputes as to the material facts surrounding these issues. The rights to the proceeds of Estate # 1 cannot be decided on summary judgment.

21

## CONCLUSION

The rights to the proceeds of Eritage Estate No. 1 cannot be decided on summary judgment.

Hendricksons are entitled to summary judgment that their security interests in the proceeds of Eritage Estate Nos. 2, 3, 4, 5, 6, 7 and 10 are entitled to priority over the claims of MKA in said proceeds.

No allocation of value has been made as to the proceeds of the specific real estate parcels or the water rights. These issues are reserved for future determination.

Counsel for the Hendricksons are directed to prepare a proposed order of partial summary judgment consistent with the terms of this Memorandum for presentation after notice.

Done this _____ day of September, 2013

JOHN ROSSMEISSL

BANKRUPTCY JUDGE

22